[Cite as *State v. Thiel*, 2017-Ohio-242.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## WYANDOT COUNTY

STATE OF OHIO,

     PLAINTIFF-APPELLEE,                     CASE NO.  16-16-01

     v.

SCOTT E. THIEL,                             **O P I N I O N**

     DEFENDANT-APPELLANT.

Appeal from Wyandot County Common Pleas Court
Trial Court No. 14CR0155

Judgment Affirmed in Part, Reversed in Part and Cause Remanded

Date of Decision:   January 23, 2017

APPEARANCES:

    *Mark J. Miller* for Appellant

    *Douglas D. Rowland* for Appellee

**ROGERS, J.**

{¶1} Defendant-Appellant, Scott Thiel, appeals the judgment of the Wyandot County Court of Common Pleas convicting him of complicity to commit felonious assault and sentencing him to two years in prison. On appeal, Thiel argues that the trial court erred in not admitting hearsay statements under Evid.R. 804(B); the trial court erred in sustaining several of the State's objections relating to his claim of self-defense; the trial court erred in failing to give requested jury instructions on complicity; the trial court erred in failing to give a requested jury instruction on self-defense; the jury's verdict was against the manifest weight of the evidence; the trial court erred in denying his motion for a new trial; and the trial court erred in failing to hold a restitution hearing. For the reasons that follow, we affirm, in part, and reverse, in part, the judgment of the trial court, and remand the matter for further proceedings.

{¶2} On September 16, 2014, the Wyandot County Grand Jury indicted Thiel on one count of felonious assault in violation of R.C. 2903.11(A)(1), a felony of the second degree and one count of complicity to commit felonious assault in violation R.C. 2923.03 and 2903.11, a felony of the second degree. The charges stemmed from a fight that occurred during which Thiel allegedly held the victim, Bob Boden, in a chokehold while his friend, Craig Young, punched Boden repeatedly.

**{¶3}** Prior to trial, Thiel filed several proposed jury instructions, including that "[t]o support a conviction for complicity, the evidence must show beyond a reasonable doubt, that [he] knowingly, assisted, encouraged, cooperated with, advised, or incited [Young] in the commission of felonious assault, and that [he] shared the criminal intent of [Young]," and that "[t]he mere presence of an accused at the scene of the crime is not sufficient to prove, in and of itself, that [he] was an aider and abettor." (Docket No. 36, p. 2).

**{¶4}** A few days later, Thiel filed a motion in limine asking the trial court to admit a statement from Young's plea hearing in which Young denied that anyone was holding Boden down while he was punching him. Thiel argued that Young's statement was admissible under Evid.R. 804(B)(3) because (1) Young was unavailable[1]; (2) his statement subjected him to criminal and civil liability; and (3) corroborating circumstances indicated the trustworthiness of his statement. The State argued, inter alia, that it was too early to determine whether corroborating circumstances indicated the trustworthiness of his statement. The trial court agreed and declined to issue a preliminary ruling.

**{¶5}** On January 7, 2016, the case proceeded to trial, where the following evidence was presented:

---

[1] The record indicates that Young died shortly after entering a plea of guilty to felonious assault for his role in Boden's assault.

{¶6} April Blue was the first witness to testify on behalf of the State. She stated that on August 16, 2014, she was bartending at the Blue Room ("the bar"), a local bar in Kirby, Ohio. She added that she had not been drinking that night. She stated that around 9:00 or 10:00 p.m., the bar started getting busy, as people were leaving Kirby Fest, a local festival. She stated that around 9:30 p.m., Thiel arrived. She added that he appeared to be having an argument with his girlfriend, Tanya Thomas, but "then it seemed like that was over with." Trial Tr., p. 36. She stated that no more than one hour later, Boden arrived. She added that nearly everyone in the bar was drinking, but no one seemed intoxicated.

{¶7} She stated that later on that evening, she heard Thiel and Young say things to Boden and his girlfriend, Amy Wellmerling, and Boden and Wellmerling say things to Thiel and Young. She explained,

> They weren't necessarily yelling. They were just more talking loud enough where the other parties could hear, or if they would talk to each other, it would be you know, insulting. Probably maybe half an hour to an hour. It wasn't like it was just a constant - - you know, it was - - there was music playing sometimes, and people were all talking to each other, and there were people coming in and out of the bar. It wasn't like it was just a constant thing.

*Id.* at p. 37-38. She added, "I really can't remember who would have started something first or said something first." *Id.* at p. 37.

{¶8} She stated that at some point, "a bunch of them went outside, and there were words spoken out there, I guess. I wasn't out there at that time, so I don't know." *Id*. at p. 38.

{¶9} She stated that later on that night, Boden and Wellmerling went to leave the bar. She explained,

> They were by the front door at first, and they walked out - - all the way through the bar and out the side door where [Thiel] and his friends were sitting by the side door. So they came all the way through the bar to walk out the side door.

*Id*. at p. 39. She added that as they walked out the door, more insults were exchanged.

{¶10} She stated that almost immediately after they walked out the door, Thiel walked out the door too. She added that Thiel appeared angry.

{¶11} She stated that nearly everyone in the bar, including Young, followed Thiel out the door. She explained, "I heard people yelling, and people were coming back into the bar, you know, panicking, like there's a fight * * *. And so when I yelled - - I pushed open the door, and I yelled to cut it out, or I was going to call the police, whatever was going on." *Id*. at p. 41-42. She added that she could not see who was involved in the fight because the light was broken.

{¶12} On cross-examination, Blue stated that she remembered Wellmerling and her friend, Bobbie Valentine, coming to the bar earlier that night and then

leaving to go back to Kirby Fest. She added, however, that she could not remember who else was there at that time.

{¶13} She stated that when Boden and Wellmerling left the bar, she heard Wellmerling make a comment to Thiel about the passing of his mother and a comment to Young about his weight.

{¶14} Finally, she stated that she could not remember how much Thiel and Boden drank that night. She added that she remembered serving some shots that night, but she could not remember who took them.

{¶15} On re-direct, she clarified that Thiel was also making comments to Boden and Wellmerling.

{¶16} On re-cross, she stated that she could not remember exactly what Thiel or Young said to Boden, but she remembered the gist of it.

{¶17} On re-direct, she stated, "I think there was [sic] comments about an improper relationship that the victim had with his sister." *Id*. at p. 56.

{¶18} Boden was the second witness to testify on behalf of the State. He stated that he knew Thiel and Young but not very well. He explained, "I've known [Thiel] - - I mean, we've chatted a few times over the years but not like as far as hanging out or anything like that. * * * I've never talked to [Young] before. I've just seen him a couple different places but never - - never had any words ever." *Id*. at p. 58.

{¶19} He stated that on the evening of August 16, 2014, he and Wellmerling went to Kirby Fest, where he had a drink and socialized with friends. He added that he could not remember what he and Wellmerling were doing prior to that. He stated that while he was at Kirby Fest, he ran into Thiel, and the two chatted briefly. He added that he could not remember what was said, but it was "nothing bad." *Id*. at p. 61.

{¶20} He explained that about 30 minutes later, Wellmerling saw Valentine, and the two walked to the bar. He stated that he stayed at the festival a little while longer and then walked to the bar too, where he had an additional two or three drinks. He added that his truck was parked at the bar, but he could not remember why.

{¶21} He stated that about 30 minutes after he got to the bar, Thiel arrived. He explained,

> [W]hen [Thiel] came in there, he started - - you know, I've never heard it out of him before or whatnot, but he seems to think there was always something going on between me and my sister. And that's when the comments would have started. * * * And then we actually went outside to smoke, and he came out there, too. And then he kind of said some more about it at that point, which I just pretty much just blowed [sic] it off.

*Id*. at p. 64-65. He added that he was also exchanging comments with Thiel but could not remember what he said.

{¶22} He stated that once Young got to the bar, Thiel did not say much to him, but the men "started saying things back and forth between themselves." *Id*. at p. 65-66. He added that he recalled hearing a comment that he "f's his sister." *Id*. at p. 66.

{¶23} He stated that he got tired of hearing the comments and decided to leave. He explained that he and Wellmerling walked through the bar toward the side door, where his truck was parked. He stated that when they walked by Thiel and Young, Young commented on his relationship with his sister, and Wellmerling replied, "[y]ou guys only wished that you could get a girl as hot as [Boden's sister.]" *Id*. at p. 67. He went on,

> So we walked out the door and went out to get into my truck. I was actually in my truck, and [Wellmerling] just sat down in the truck, and that's when [Thiel] followed - - followed us out. At that time, I didn't even realize he was behind us coming out. I went out and sat in my truck. [Wellmerling] got out and sat in the truck. And that's when [Thiel] came around to the passenger's door with [Wellmerling].

*Id*. at p. 67-68. He stated that Thiel opened the passenger door and started chatting back and forth with Wellmerling about his deceased mother. He added that the conversation was not necessarily polite and that Thiel was "more like yelling." *Id*. at p. 70.

{¶24} He stated that at some point, Thiel reached into the truck and grabbed Wellmerling. He explained, "[O]nce that happened, that's when I opened up the door. [Thiel] ran to the back of the truck, and I ran to the back of the truck, and

-8-

that's where we met." *Id*. at p. 71. He stated that did not remember whether they came at each other swinging, but once they met, they wrestled to the ground. He explained,

> Once we got down and got into the stones, [Thiel] actually got me - - I remember when I ended up, he was on his back, and I was on top of him. And he ended up getting me in a choke hold, because I can remember him having his arm around my neck and pulling me back * * *.

*Id*.

**{¶25}** He stated that as he was laying on the ground, he saw Young run out of the door. He explained that Young got on top of him and started punching him in his right eye repeatedly. He added that he was punched between 10 and 15 times.

**{¶26}** He went on,

> The only thing - - I remember yelling for help, and I remember begging them to stop. Please stop. I remember saying, 'I've had enough. Please stop.' And I remember trying to get my arm up. And then all at once - - I don't know what happened, but everybody just scrambled at that point. Once the hitting was done or whatever, I was let go, and they were gone.

*Id*. at p. 75.

**{¶27}** Boden stated that he was disorientated after the assault, but he remembered Valentine driving him and Wellmerling to her house, where he was later met by police and EMS services. He stated that he sustained a broken orbital bone as a result of the assault and later underwent surgery to repair the damage. He added, however, that he continues to have headaches and difficulty seeing.

{¶28} On cross-examination, Boden stated that he parked his truck at Valentine's house that night. He admitted, however, that he could not remember how his truck ended up at the bar.

{¶29} He stated that he drank one beer at Kirby Fest and two or three "Red Bull Vodkas" at the bar. He added that he and Wellmerling were not intoxicated.

{¶30} Then, the following exchange occurred:

[Defense Counsel]: Do you remember telling hospital personnel at [the hospital] that you had three shots of tequila that night?

[Boden]: No, I don't.

[Defense Counsel]: Then why would that information be in your medical records?

[Boden]: I don't know.

* * *

[Defense Counsel]: Would they also be lying about the fact that they found cocaine in your system?

[Boden]: No.

[Defense Counsel]: You were on cocaine that night. Tell the jury.

[Boden]: Not that night, no.

[Defense Counsel]: Well, when?

[Boden]: Like two nights prior to that.

*Id.* at p. 92-93.

{¶31} Boden stated that Wellmerling did not make a comment about Thiel's mother on her way out of the bar. He stated that she only made a comment to Young about his sister. Boden stated that when he and Thiel met at the back of his truck, they were swinging at each other. He stated that he swung at Thiel at the same time Thiel swung at him. He added, however, that they never actually hit each other. He also acknowledged that his written statement to police did not mention that Thiel had grabbed Wellmerling's arm.

{¶32} Finally, Boden stated that he had a pending lawsuit against Thiel, Young, Thiel's father, and Dennis Snyder to obtain compensation for his medical bills and lost wages.

{¶33} Amy Wellmerling was the third witness to testify on behalf of the State. She stated that on August 16, 2014, she and Boden went to Valentine's house and then walked to Kirby Fest. She stated, however, that she and Valentine left shortly thereafter, stopped back at Valentine's house, and then went to the bar, where Boden met them a little while later.

{¶34} She testified that she, Valentine, and Boden were sitting at one end of the bar and Thiel, Joshua Moses, and Snyder were sitting at the other end of the bar. She stated that she believed Thomas was there as well. She added that she was drinking "Red Bull and vodka" and Boden was likely drinking the same. *Id.* at p. 121.

{¶35} She explained that while they were at the bar, Thiel started yelling things like "[Boden] sleeps with his sister; that he was, I think, a coke head; that he was disgusting." *Id*. at p. 122. She explained that at some point, she, Boden, and Valentine went outside to smoke, and Thiel and Moses followed them out. She stated, "[Boden] was sitting on the picnic table, and I was standing in front of him. And then [Thiel] got up and walked over to [Boden], like he was going to fight him. [Moses] held [Thiel] back out there, and [Thiel] said something along the lines of, you're having two girls hold you back." *Id*. at p. 123. She stated that they went back, but when the bickering continued, they decided to leave.

{¶36} She stated that as they walked out the side door, they passed Thiel and Young, and she told Young, "you wish you could get a girl like [Boden's sister.]" *Id*. at p. 214. She explained that they walked out the door and got into Boden's truck, which was right outside. She stated that as she was closing her door, Thiel opened up her door and touched her arm. She clarified, however, "he just grazed [my arm]. It wasn't anything, you know, aggressive. He was just coming over to open the door to talk, which, at the time, we were talking decently throughout the night, me and him, trying to not start a fight, because I've never had an issue with [Thiel] until this night." *Id*. at p. 125.

{¶37} She explained that when Thiel touched her arm,

[Boden] came around the truck, and then [Thiel] went around the truck, and then they met right at the back of the truck. * * * Then they

-12-

started fighting. And [Thiel] was on top of [Boden]. And then somewhere, out of nowhere, [Young] came out of the blue, and then [Thiel's] dad came out from nowhere. There was a bunch of people out there. And they started fighting behind the truck. [Young] and [Thiel] were on top of [Boden] * * *.

*Id*. at p. 126. She added that Young was hitting Boden, but she could not remember for sure whether Thiel had Boden in a headlock while Young was punching him.

{¶38} She explained that she was trying to get Thiel off Boden when

[Thiel's father] came over and ripped me by my hair, which I had marks - - I had scars and scratches on my hand. He dragged me - - which I didn't know it was [Thiel's father] at the time, but he dragged me down the alley by my hair. By the time I got back up, after he dragged me, [Boden] was already in the truck, and we were trying to leave.

*Id*. at p. 127. She added that she may have scratched Thiel in an attempt to get him off Boden.

{¶39} She stated that at some point after the assault, she talked with Thiel and told him that she would make sure he did not go to jail. She stated that she was upset with Boden at the time because they were going through a custody battle and did not want Boden to get any money.

{¶40} On cross-examination, she stated that when Boden left Kirby Fest, he went to Valentine's house, got his truck, and drove it to the bar. She stated that she took shots of tequila that night and assumed Boden did too. She added that although she was drunk that night, she "absolutely did not" make a comment about Thiel's mother on her way out of the bar. *Id*. at p. 134.

**{¶41}** Finally, Wellmerling admitted to sending Thiel multiple messages including, "Hey, we need to talk. This is all bullshit. I'm over it. I'm willing to testify for you in court. I want to make sure [Boden] doesn't get a dime from anyone, and I want to make sure you don't go to jail." *Id.* at p. 143. She reiterated, however, that she was upset with Boden when she sent those messages.

**{¶42}** Bobbie Valentine was the fourth witness to testify on behalf of the State. She stated that on the evening of August 16, 2014, Boden and Wellmerling met her at her house before the three walked over to Kirby Fest. She stated that she and Wellmerling left the festival, went back to her house for a drink, and then went to the bar. She added that Boden met them there a little later.

**{¶43}** She explained that while they were at the bar, Thiel and Boden were exchanging rude comments. She stated that when she, Boden, and Wellmerling went outside to smoke, Thiel followed them out and "said some things." *Id.* at p. 151. She added that she, Boden, Wellmerling, and Moses "kind of had to, you know, push him back and settle him down." *Id.*

**{¶44}** She stated that when Boden and Wellmerling left the bar for the night, they walked out the side door. She stated, "then everybody started screaming and running for the door." *Id.* at p. 152. She stated that when she got outside, she saw Thiel and Boden swinging at each other. She explained that Thiel took Boden down

to the ground and held him in a chokehold while Young got on top of him and started punching him with his fist. She added that Boden was screaming.

{¶45} She stated that while this was going on, Wellmerling was trying to get Thiel off Boden, but Thiel's father grabbed ahold of Wellmerling's head and pulled her off Thiel, dragging her a few feet away. Valentine added that she went to help Wellmerling, and by the time Wellmerling was released, Boden was sitting in his truck. She added his eye was swollen and bloody.

{¶46} On cross-examination, she testified that she had been drinking that night, but she "wasn't stumbling" and "knew what [she] was doing." *Id*. at p. 161. She added that she did not take any shots but believed Boden and Wellmerling took one.

{¶47} She stated that she heard Thiel say things at the bar that night, but she did not hear Wellmerling say anything to Thiel or Young when Wellmerling left.

{¶48} Finally, she stated that she gave two statements to police: one on the night of the incident and one a few days later. She explained, "it was hard to write that night. We were in the dark behind my house. We were crying; we were upset. * * * So they came back." *Id*. at p. 168. She acknowledged, however, that her first statement did not include that Boden was in a headlock while Young was punching him.

{¶49} Deputy Travis Yeater of the Wyandot County Sheriff's Office was the fifth witness to testify on behalf of the State. He stated that on August 17, 2014, he went to Thiel's father's shop in Kirby, Ohio and photographed Thiel's injuries which consisted of scratches and abrasions to his neck and arms. The photographs were later admitted into evidence.

{¶50} On cross-examination, Deputy Yeater testified that he did not really talk with Thiel about the assaults because he was not investigating the matter. He acknowledged, however, that he wrote a statement in which he stated that he had spoken with Thiel and Thiel's father about the assault. He clarified, however, that the report was in connection with "a different call." *Id.* at p. 189.

{¶51} Joshua Moses was the sixth witness to testify on behalf of the State. He stated that he was at the bar on the evening of August 16, 2014 and witnessed part of Boden's assault. He stated that he saw Thiel holding Boden in a chokehold and someone hitting Boden. He added, however, that he could not see who was hitting Boden because there were too many people standing around. He also admitted that he had been drinking that night.

{¶52} Moses testified that the following day, he saw Thiel at Thiel's father's shop. He explained that Thiel, Thiel's father, Randy Roberts, and Vince Rowland were discussing what happened the previous night and came to an agreement that

they would "try[] to make it seem like [Boden] was the aggressor in it all, and that's what led to the fight." *Id*. at p. 195. He added that he had sobered up by this time.

{¶53} On cross-examination, Moses reiterated that he only saw parts of the fight. He stated, "I just saw the ending. I saw [Thiel's father] pull [Wellmerling] off of [Thiel], and [Thiel] released the chokehold right then and there." *Id*. at p. 197. Moses acknowledged, however, that his statement to police did not mention Thiel holding Boden in a chokehold.

{¶54} Tanya Thomas was the seventh witness to testify on behalf of the State. She stated that she and Thiel were dating at the time of the alleged assaults but were no longer together.

{¶55} She stated that on August 16, 2014, she, Thiel, and a few of their friends went to Kirby Fest, where they saw Boden. She stated that when she spoke with Boden, Thiel got upset with her.

{¶56} She stated that later on at the bar, the two men exchanged words, and when Boden and Wellmerling left, Thiel followed them out. She explained, "[Boden] swung at [Thiel], "[Thiel] wrestled him to the ground," and "had [Boden] in a headlock." *Id*. at p. 204. She stated that Young came out of nowhere and swung at Boden. She added, "then [Thiel] let go of [Boden] and then [Young] hit [Boden].

*Id.* at p. 204-205. She reiterated that Thiel did not have Boden in a chokehold when Young was hitting him.[2]

**{¶57}** On cross-examination, she explained that when Boden and Wellmerling left the bar, Wellmerling made comments about Thiel's mother. She stated that outside the bar, Boden swung at Thiel. She added that she was unsure whether Boden made contact with Thiel's face but Thiel had some injuries after the fight.

**{¶58}** Finally, she stated that Thiel and Boden were both drinking that night, but she was not. She added that she was unsure whether Wellmerling and Valentine were drinking.

**{¶59}** Sergeant Dwight Kramer of the Wyandot County Sheriff's Office was the eighth witness to testify on behalf of the State. Sergeant Kramer stated that he responded to the initial call at the bar and interviewed Thiel and Thomas the following evening. He stated that during his interview with Thiel, Thiel stated "that [he] and [Boden] had had words in the bar a couple of times, and then he went outside to talk with [Wellmerling] about something she had said." *Id.* at p. 217. He stated that Thiel admitted to getting into a physical altercation with Boden, putting him in a chokehold, and taking him to the ground. He added that Thiel denied

---

[2] The State then played a portion of Thomas's recorded interview with Sergeant Kramer in which she suggested that Thiel may have been holding Boden when Young was hitting him. The State later admitted the entire interview—in which Thomas initially denied knowing who hit Boden—as impeachment evidence. Although perhaps improper, Thiel has not argued the issue on appeal and we need not address its propriety.

knowing what happened after that and told me "he was getting hit as he was holding [Boden] down on the ground." *Id.*

**{¶60}** Thereafter, the State played the recoding of Thiel's interview for the jury, and it was later admitted into evidence.

**{¶61}** On cross-examination, Sergeant Kramer stated that when he arrived at the bar, it was dark outside, but the parking lot was partially lit by a nearby security light. He added that he did not recall the security light being broken. He stated that he spoke with several people at the bar but did not formally interview anyone until later. He stated that he interviewed Thiel and Thomas the following evening and that he interviewed Boden, Wellmerling, and Valentine several days later. He added that he did not know whether anyone talked to Young.

**{¶62}** Deputy Chris Verhoff of the Wyandot County Sheriff's Office was the final witness to testify on behalf of the State. He stated that just after midnight on August 17, 2014, a call came in about a fight that broke out at the bar. He stated that when he got on scene and saw Boden's injuries, he radioed for emergency services. He explained that Boden sustained injuries to his right eye, right ear, and right elbow. He added that he took pictures of Boden's injuries, and those pictures were later admitted into evidence.

**{¶63}** On cross-examination, Sergeant Verhoff stated that before he went to the bar, he went to Valentine's house, where Boden was. He stated that when he

-19-

got to the bar, he interviewed several people, including Thiel's father and Blue. He added that "at first, [Thiel's father] wasn't providing a whole lot of information as to exactly what happened but after a while, he did say there was an altercation." *Id.* at p. 240. He stated that after leaving the bar, he explored Kirby looking for Thiel and Young. He added that he did not speak with Young, but he believed someone else did.

{¶64} Thereafter, the State rested, and Thiel moved for an acquittal on both counts, which the trial court denied.

{¶65} Randy Roberts was the first witness to testify on behalf of the defense. He stated that he was at Kirby Fest on the evening of August 16, 2014, socializing with Thiel and Young. He stated that he and Thiel eventually left Kirby Fest and went to the bar.

{¶66} He stated that at some point, Thiel and Young were sitting at one end of the bar, Boden and Wellmerling were at the other end of the bar, and he was sitting somewhere in the middle. He stated that he did not remember anything unusual happening, until Boden and Wellmerling walked by Thiel and Young and said "words" to them. *Id.* at p. 255. He clarified, however, "I don't recall what was said. Like, I didn't hear it. I just know words were said." *Id.*

{¶67} He stated that everyone went outside, and as he walked out the door, a fight started. He explained,

> That's when I seen [sic] [Boden] get out of his truck, and him and [Thiel] met at the back of the truck, and [Boden] swung at [Thiel], and they went to tackle to [sic] the ground. And at that point, everybody piled around. They were in between two vehicles. And at that point, you couldn't see anything, and it was over like real fast.
>
> * * *
>
> At that point, that's when [Thiel's father] came around the corner from his shop. And he ran over and yelled, "Stop fighting." And he was trying to break up the fight, and that's when he pulled [Wellmerling] off and sat her aside, trying to break the fight up. He didn't know who he was getting at first. He just ran over and got the first person off the top to break it up.

*Id.* at p. 256-257. He added that it was dark and people were screaming and yelling, so he could not hear anything that was being said.

{¶68} He stated that the next day, he went to Thiel's father shop where he saw Thiel, Thiel's father, and Moses. He added that he did not recall having a conversation with Moses but acknowledged that Moses was there when everyone was giving their written statements to Deputy Yeater.

{¶69} On cross-examination, Roberts stated that he was drinking heavily that night, but he "wasn't wasted." *Id.* at p. 260. He admitted that after Boden and Thiel went to the ground, he could not see anything. Specifically, he stated that he could not see who was hitting Boden or whether Thiel had Boden in a headlock at that time.

{¶70} Finally, the Prosecutor inquired about what happened at Thiel's father's shop the next day:

        The Prosecutor: You just testified that there was a point in time where there were people there without [Deputy Yeater] being there.

        [Roberts]: Yes.

        [The Prosecutor]: And during that time, you had no conversation with anyone else about what happened the night before?

        [Roberts]: No.

        [The Prosecutor]: There was no, whew, that was a rough night?

        [Roberts]: No.

        [The Prosecutor]: Nothing? You didn't discuss it at all?

        [Roberts]: No.

*Id.* at p. 255-265.

**{¶71}** Dennis Snyder was the second witness to testify on behalf of the defense. He stated that he was also at Kirby Fest on the evening of August 16, 2014, socializing and having some drinks. He stated that Thiel and Boden "had some words" at the festival "but nothing really transpired from it." *Id.* at p. 268. He clarified, however, that he did not hear what they said but "could just tell by the way they were talking." *Id.* at p. 269.

**{¶72}** He stated that he walked down to the bar, and when he arrived, the place was pretty empty. He stated that Blue told him everyone was outside in the smoking area. He explained that he sat down at the bar, and at some point, Boden, Wellmerling, Valentine, Thiel, Young, and a few others came back inside and sat

down at the bar. He added, "[Boden] and [Wellmerling] went down towards the end where the jukebox was. I was sitting about in the middle, and [Thiel] and [Young] were down by the back door." *Id*. at p. 270.

{¶73} He stated that later on, as Boden and Wellmerling walked by Thiel and Young on their way out, "words were exchanged" and then "all of them went outside." *Id*. at p. 270.

{¶74} He stated that he walked over to the side door, saw a struggle going on near the side of a vehicle, and heard yells. He added that it was dark and he could not tell who was involved. He stated that as he walked out the door, he saw more of what was going on.

> I seen [sic] [Young] grab ahold of - - or had a hold of [Boden] around the front like this (indicates) and he was dragging him backwards in front of that vehicle, and he was spinning him around from his left coming around. When he got to the edge of the vehicle, he let go of him, and he flew up in between that car and a pickup truck, which I found out was [Boden's.]
>
> * * *
>
> [Young] went right after him and mounted on his back as I - - I was just about on the alleyway. And that [sic] when I yelled at him to - - that's enough, stop. I yelled, that's enough. Break it up. And I started to cross the alley after them.
>
> * * *
>
> Then I came up behind them, and [Young] was on his back. It looked like he was holding him down. I did not see his elbows moving, but he was holding him down. There was a little bit of a struggle. That's when I yelled at [Young] again. I said, That's enough. I said,

[Young], stop. I grabbed his shirt. And then he must have come to his senses, and he let go of him. And then he released and came up, and I turned him around and said, [Young] that's enough. It's over. About that time, I heard the truck door close. I turned around to this direction, and I seen [sic] [Boden] was in his truck holding his face like this.

*Id.* at p. 272-275.

{¶75} He stated that he did not see Thiel or Wellmerling when he was outside. He added, "They were probably in the darkened area where I couldn't see anything." *Id.* at p. 276. He added that he did not see Thiel's father until after the fight was over. Finally, he stated that he was drinking that night too.

{¶76} On cross-examination, Snyder stated that there was "maybe ten seconds, ten to fifteen seconds, maybe twenty or better" before he got to the side door. *Id.* at p. 280. He stated that when he looked out the side door, he could not tell whether Thiel had Boden in a headlock or whether Thiel had Boden in a headlock while Young was punching him. He added, however, that when he opened the door and walked outside, he saw Young pick Boden up and throw him.

{¶77} Tanya Thomas was the third witness to testify on behalf of the defense. She stated that after the fight, she photographed Thiel's injuries, which consisted of severe scratching on the front of Thiel's neck and additional scratching on the back of the neck and forehead. The photographs were later admitted into evidence.

{¶78} On cross-examination, Thomas stated that she photographed Thiel's injuries at Thiel's father's shop. She stated that Thiel's father was probably there, but she could not remember if anyone else was there.

{¶79} Chris Thiel ("Chris") was the fourth witness to testify on behalf of the defense. He testified that on the evening of August 16, 2014, he went to Kirby Fest with Thiel's father. He explained that he talked with several people while at the festival, including Thiel. He stated that he did not see any confrontation between Thiel and Boden at the festival, but he did observe Boden staring at Thiel.

{¶80} He stated that he and Thiel's father left Kirby Fest when the music ended, stopped by Thiel's father's house, and then went to Thiel's father's shop. He stated that after hanging out at the shop for a little while, they walked to the bar.

{¶81} He stated that as they were about to walk into the bar, he heard yelling and screaming. He stated that instead of going inside, they walked toward the alley. He explained,

> It was kind of dark. We couldn't really see much. We heard a lot of screaming and yelling, and [Thiel's father] just kind of got ahead of me a little bit. And there was a fight in the parking lot, so he pulled somebody off. I couldn't actually see if it was a guy or a girl, but it was a girl, and he sat her down and he grabbed [Thiel] and put him up against the wall.

*Id*. at p. 291. He added that Thiel's father never pulled the girl down the alley.

{¶82} He stated that after the fight broke up, he and Thiel's father went back to Thiel's father shop. He added that he could not remember whether anyone showed up after that.

{¶83} On cross-examination, Chris stated that he did not see the fight and he did not see Boden or Young. He stated that he had been drinking earlier that night, but he was not really impaired.

{¶84} Thiel's father was the fifth witness to testify on behalf of the defense. He stated that on the evening of August 16, 2014, he and his wife went to Kirby Fest with Chris and Thiel. He stated that nothing really unusual happened, "[b]ut [Boden] had an issue or something with * * * [Thiel]." *Id*. at p. 299. He added that he did not know what the issue was about.

{¶85} He stated that later on, Thiel walked to the bar, and he and Chris walked there, too, after stopping by his house and shop. He stated that as they walked up to the bar, he heard Snyder say "enough, enough." *Id*. at p. 303. He explained that they walked to the side of the building, where he saw two people on the ground and heard Blue say, "Please, somebody break it up." *Id*. at p. 303-304. He added that he could not see who the two people were because it was dark outside.

{¶86} He stated that he reached down and picked up one person and sat the person on the ground before that person took off running. He stated that he reached

down and grabbed the other person and put that person against the wall. He added that when he separated the two people, he realized that it was Wellmerling and Thiel.

{¶87} He stated that several cars left the parking lot thereafter and "that's about the extent of it." *Id.* at p. 305. He added that he and Chris went to his shop after.

{¶88} Finally, he stated that he spoke with Thiel and Deputy Yeater the next day, but denied having any conversation about blaming Boden for the fight. He added that he observed injuries to Thiel's face.

{¶89} On cross-examination, Thiel's father admitted that he showed up at the end of the fight and did not know how Boden sustained his injuries. He added that he never saw Boden or Young.

{¶90} He stated that Thiel and Thomas came down the following morning and took photographs of Thiel's injuries but then acknowledged that they may have come after the fight.

{¶91} Finally, he stated that he spoke with Thiel about the fight the following afternoon.

{¶92} Thiel was the final witness to testify on behalf of the defense. He stated that on the evening of August 16, 2014, he went to Kirby Fest with family and friends. He stated that Boden was there, too, "just giving me like an evil eye."

*Id.* at p. 319. He added that when Boden talked to Thomas and her friend, he joked with Boden about Boden taking the women home.

**{¶93}** He stated that after that, he and Roberts walked to the bar. He added that at that point, he had only had a couple beers. He stated that when he got to the bar, he sat down and ordered a drink. He added that he only had two beers the entire time he was there.

**{¶94}** He stated that when Boden arrived, he sat down with Wellmerling and Valentine. He stated that while he was sitting at the bar, "[Boden] was staring at [him] and told [him] to come here." *Id.* at p. 323. He added that he went over to Boden, and they had a brief, unpleasant exchange.

**{¶95}** He stated that Boden was also staring at him when he went outside to smoke. He stated, "I asked him what his problem was. And he said I had a problem with him. And I said, No, I don't." *Id.* at p. 324. He added that he finished his cigarette and then went back inside.

**{¶96}** He stated that about 30 minutes later, Boden and Wellmerling got up to leave, and on their way out, Wellmerling made a comment to him about his mother. He stated that it "kinda of [sic] hurt that she would say that" because he did not have any prior issue with her. *Id.* at p. 326. He added that he followed her outside to ask her why she made the comment.

{¶97} He stated that he spoke with Wellmerling outside the passenger door of the truck. He denied ever touching her arm. He stated that Boden made a comment to him from inside the truck, to which he replied, "F off." *Id.* at p. 327. He explained, "And he jumps out and starts running to the back of the truck. So I met him at the back of the truck * * *." *Id.* He added that Boden swung and hit him, injuring the upper left side of his face.

{¶98} Then, the following colloquy occurred:

[Defense Counsel]: After he hit you, what did you do next?

[Thiel]: I took him to the ground.

[Defense Counsel]: Why?

[Thiel]: Because nobody likes to be getting hit.

[Defense Counsel]: Did you feel as if you were defending yourself?

[The Prosecutor]: Objection.

The Court: Sustained.

[Defense Counsel]: Did you feel that you were protecting yourself?

[Thiel]: Yes.

[The Prosecutor]: Objection.

The Court: Sustained.

[Defense Counsel]: Did you feel that you were in harm?

[The Prosecutor]: Objection.

The Court:  Sustained.

[Defense Counsel]:  Your Honor, this goes to self-defense.

The Court:  You can't ask leading questions on direct, however.

[Defense Counsel]:  They're not leading.

The Court:  They are.

[Defense Counsel]:  How did you feel when [Boden] struck you?

The Court:  There you go.

[Defense Counsel]:  Thank you.

[Thiel]:  Threatened.

*Id*. at p. 328-329.

{¶99} Thiel stated that when they got to the ground, he and Boden were on their right sides, and he had Boden in a chokehold.  He explained, "Then someone jumps on top of me and starts scratching and punching me," and "I let go."  *Id*. at p. 330.  He added that his face was buried in the back of Boden's head to keep from getting punched.  He explained that when he let go, the person was still on top of him but then his dad pulled that person off of him and put him against the wall.  He testified that he never saw Young punch Boden and he was not holding Boden down while Young punched him.

{¶100} He stated that after the fight, he spoke with Young and a few other people. He stated that he and Thomas stopped by his house, before going to his father's shop. He added that he went to the Sherriff's office the following day.

{¶101} On cross-examination, he denied making comments to Boden about Boden's relationship with his sister. He admitted, however, that he was "not happy" with Boden and was upset at Thomas that she was talking to Boden at Kirby Fest. He also admitted that he was best friends with Young.

{¶102} He stated that he wrestled in middle school and a little bit in high school, but he did not have the "upper hand" on Boden when they met at the back of the truck.

{¶103} He stated that his head was buried in the back of Boden's head and he did not know whether someone was hitting Boden. He stated that he did not hear Boden say anything.

{¶104} On re-direct, the following colloquy occurred:

Defense Counsel: Did you go to the [the bar] that night and have a plan with [Young] to beat up [Boden]?

Thiel: Not at all.

Defense Counsel: The fight happened quickly?

Thiel: Yes, sir.

Defense Counsel: You were trying to protect yourself?

Thiel: Yes.

The Prosecutor:  Objection.

The Court: Sustained

\* \* \*

Defense Counsel:  Do you know how you and [Boden] got separated from off the ground?

[Thiel]:  No, sir.  I let go. \* \* \*

*Id*. at p. 343-344.

**{¶105}** Thereafter, the jury was excused, and Thiel asked that Young's statement from his plea hearing be admitted and that the jury be instructed on self-defense.  The trial court made the following rulings:

As to the self-defense instruction, research indicates that it must be shown [Thiel] was not at fault in creating the situation giving rise to the affray; [Thiel] had a bona fide belief he was in imminent danger of death or great bodily harm; [Thiel] did not violate any duty to retreat or avoid danger.  The evidence was clear that [Thiel] did follow the victim, the alleged victim, out of the bar; that when the victim got out of his truck, he met him.  And so because of failing to meet those requirements, the Court will not enter a self-defense instruction.

As to the [Young] statement, it is clear [Thiel] and [Young] were good friends.  [Thiel] said he was one his best friends.  Indeed, the evidence, as given at [Young's] plea, was that [Young] was willing to beat a man he did not really know for the benefit of his friend or to help his friend out.  Therefore, when one inculpates himself and exculpates someone else, suspicion arises concerning fabrication or collusion. Therefore, how trustworthy is Young's statement that no one was holding the victim down when he struck him?   The defense established that this incident happened in a dark place with much chaos, so how would [Young] - - how could [Young] tell if someone was or was not holding the victim down while he was punching him?

-32-

> Further, Young's statements would suggest the victim willingly laid in one position to allow him to hit him over and over. Given how long witnesses testified the event took place, it is not credible to believe that the victim and [Thiel] engaged in their incident and then, after that was over, [Young] assaulted the victim.
>
> There was not sufficient corroboration to allow this hearsay statement that was not under oath and not tested in any adversary [sic] way to permit it into evidence.

*Id*. at p. 355-357.

**{¶106}** Thiel also requested that the jury be instructed that the accused must share the criminal intent of the principal, pursuant to the Supreme Court of Ohio's finding in *State v. Johnson*, 93 Ohio St.3d 240 (2001). The trial court declined to give the proposed instruction, noting that "[i]t's referenced that the instructions that are in OJI were drawn from that case." *Id*. at p. 359.

**{¶107}** Ultimately, the jury acquitted Thiel of felonious assault but convicted him of complicity to commit felonious assault.

**{¶108}** On January 21, 2016, Thiel filed a motion for a new trial, arguing that the trial court erred in failing to instruct the jury on self-defense and that multiple jurors felt pressured and unduly influenced to reach a verdict. Attached to Thiel's motion were the affidavits of three jurors and case law on self-defense.

**{¶109}** On January 29, 2016, the trial court denied Thiel's motion.

{¶110} On March 1, 2016, a sentencing hearing was held where the trial court sentenced Thiel to two years in prison and ordered him to pay restitution to Boden in the amount of $21,519.37.

{¶111} It is from this judgment that Thiel appeals, presenting the following assignments of error for our review.

*Assignment of Error No. I*

**THE TRIAL COURT ERRED AS A MATTER OF LAW IN FAILING TO GIVE APPELLANT'S REQUESTED JURY INSTRUCTIONS ON COMPLICITY.**

*Assignment of Error No. II*

**THE TRIAL COURT ERRED AS A MATTER OF LAW WHEN IT FAILED TO INSTRUCT THE JURY ON SELF-DEFENSE.**

*Assignment of Error No. III*

**THE TRIAL COURT ERRED IN NOT ADMITTING CRAIG YOUNG'S STATEMENTS AGAINST INTEREST UNDER EVIDENCE RULE 804(B)(3).**

*Assignment of Error No. IV*

**THE TRIAL COURT DENIED THE APPELLANT A FAIR TRIAL AND HIS RIGHT TO DUE PROCESS WHEN IT SUSTAINED SEVERAL OF THE STATE'S OBJECTIONS RELATING TO APPELLANT'S CLAIM OF SELF-DEFENSE.**

*Assignment of Error No. V*

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION FOR NEW TRIAL.**

*Assignment of Error No. VI*

**THE TRIAL COURT JURY VERDICT THAT APPELLANT WAS GUILTY OF COMPLICITY TO FELONIOUS ASSAULT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

*Assignment of Error No. VII*

**THE TRIAL COURT'S CUMULATIVE ERRORS DEPRIVED THE APPELLANT OF A FAIR TRIAL EVEN IF ONE ERROR ALONE DID NOT RISE TO THAT LEVEL.**

*Assignment of Error No. VIII*

**THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT FAILED TO CONDUCT AN EVIDENTIARY HEARING PURSUANT TO OHIO REVISED CODE SECTION 2929.18(A)(1), AFTER APPELLANT SPECIFICALLY OBJECTED TO THE AMOUNT OF RESTITUTION ORDERED.**

{¶112} Due to the nature of Thiel's assignments of error, we elect to address them out of order.

*Assignment of Error No. IV*

{¶113} In his fourth assignment of error, Thiel argues that the trial court erred in sustaining several of the State's objections relating to his claim of self-defense. Specifically, Thiel argues that by sustaining the State's objections, the trial court prevented him from developing his theory of self-defense. We disagree.

{¶114} A leading question suggests an answer or instructs a witness "how to answer or puts into his mouth words to be echoed back." *State v. D'Ambrosio*, 67

Ohio St.3d 185, 190 (1993). Evid.R. 611(C) provides, in pertinent part, that "[l]eading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony." However, despite this limitation, "[t]he allowing or refusing of leading questions in the examination of a witness must very largely be subject to the control of the court, in the exercise of a sound discretion." *Ramage v. Cent. Ohio Emergency Serv., Inc.*, 64 Ohio St.3d 97, 111 (1992). A trial court will be found to have abused its discretion when its decision is contrary to law, unreasonable, not supported by the evidence, or grossly unsound. *State v. Boles*, 187 Ohio App.3d 345, 2010-Ohio-278, ¶ 16-18 (2d Dist.). When applying the abuse of discretion standard, a reviewing court may not simply substitute its judgment for that of the trial court. *State v. Slappey*, 3d Dist. Marion No. 9-12-58, 2013-Ohio-1939, ¶ 12.

**{¶115}** At trial, Thiel testified that after Boden hit him, he took Boden to the ground because he did not like being hit. Defense counsel followed up by asking Thiel whether he felt he was defending and protecting himself. The State objected, and the trial court sustained the objections on the grounds that the questions were leading. After defense counsel rephrased his questions, Thiel testified that he took Boden to the ground because he felt threatened. On redirect, defense counsel again asked, "You were trying to protect yourself?" Trial Tr., p. 343. Thiel replied,

"Yes." *Id*. The State quickly objected. The trial court sustained the objection but gave no limiting instruction.

{¶116} The trial court could have reasonably concluded that defense counsel's questions were leading insofar as they "put[] into [Thiel's] mouth words to be echoed back." *D'Ambrosio* at 190. But even if the trial court had erred, Thiel's argument that the trial court's ruling prevented him from developing his theory of self-defense is meritless because after defense counsel rephrased his questions, Thiel testified that he took Boden to the ground because he felt threatened (i.e., he took Boden to the ground in self-defense). Defense counsel was free to develop this testimony but chose not to.

{¶117} For these reasons, we find that the trial court did not abuse its discretion in sustaining the State's objections relating to Thiel's claim of self-defense.

{¶118} Accordingly, we overrule Thiel's fourth assignment of error.

*Assignment of Error No. III*

{¶119} In his third assignment of error, Thiel argues that the trial court erred in not admitting Young's statements as statements against interest under Evid.R. 804(B)(3). Specifically, Thiel argues that the statements should have been admitted because (1) Young was unavailable; (2) they exposed Young to criminal and civil

liability; and (3) corroborating circumstances indicated the trustworthiness of Young's statements. We disagree.

**{¶120}** Hearsay is inadmissible unless otherwise permitted by constitutional provision, statute, or the Ohio Rules of Evidence. Evid.R. 804(B) provides,

> The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> * * *
>
> (3) Statement Against Interest. A statement that was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless the declarant believed it to be true. A statement tending to expose the declarant to criminal liability, whether offered to exculpate or inculpate the accused, is not admissible unless corroborating circumstances clearly indicate the truthworthiness of the statement.

**{¶121}** In other words, for statements to qualify under the statement against interest exception, it must be established that (1) the declarant is unavailable as a witness, (2) the statements were against the declarant's interests and tended to subject him to criminal or civil liability, and (3) corroborating circumstances indicate the trustworthiness of the statements. Evid.R. 804(B)(3). All three elements must be present in order for the statements to be admissible under Evid.R. 804(B)(3). *State v. Newsome,* 3d Dist. Putnam No. 12-12-03, 2012-Ohio-6119, ¶ 36, citing *State v. Gilliam*, 70 Ohio St.3d 17, 20 (1994). Admission of hearsay

pursuant to Evid.R. 804(B)(3) is within the sound discretion of the trial court and will not be disturbed absent an abuse of discretion. *Newsome* at ¶ 36, citing *State v. Sumlin*, 69 Ohio St.3d 105, 108 (1994).

**{¶122}** In excluding Young's statement, the trial court found that the first two elements were satisfied but that there were insufficient corroborating circumstances to indicate the statement's trustworthiness. It noted, for example, that Thiel and Young were good friends and that the evidence presented at Young's sentencing hearing was that Young attacked Boden for the benefit of Thiel. To that end, it noted that when one inculpates himself and exculpates someone else, suspicion of fabrication or collusion arise. It also questioned how Young could tell whether someone was holding Boden down while he was punching Boden when the defense established that the assault occurred in a dark place with a lot of chaos. It further noted that Young's statements would suggest that Boden willingly laid in one position while Young hit him repeatedly.

**{¶123}** Thiel argues, however, that there were other corroborating circumstances that indicated the statement's trustworthiness. He argues that (1) the statement was made after he waived his constitutional rights and the court ensured he was competent and that he was knowingly, voluntarily and intelligently entering his plea; (2) given his guilty plea, there is no evidence he made his statement in an

effort to obtain any favor with authorities or the court; and (3) Thiel and Thomas testified that no one was holding Boden down while Young was punching him.

{¶124} The fact that Young made his statement during his plea allocution does not automatically render the statement trustworthy. Likewise, an absence of evidence indicating the untrustworthiness of the statement does not automatically render the statement trustworthy. Rather, the relevant inquiry is whether the corroborating circumstances indicate the statement's trustworthiness. While Thiel argues that his and Thomas' testimony corroborates Young's statements, Thiel's testimony was self-serving and Thomas's recorded interview raised some questions about her credibility. These factors are relevant in considering whether and to what extent their testimony corroborates Young's statement.

{¶125} After considering the evidence presented at trial, the trial court expressed valid concerns about the statement's trustworthiness, and considering the general rule against hearsay, we cannot say that the trial court abused its discretion in excluding the statement.

{¶126} Accordingly, we overrule Thiel's third assignment of error.

*Assignment of Error No. II*

{¶127} In his second assignment of error, Thiel argues that the trial court erred by failing to give his requested jury instruction on self-defense. Specifically,

Thiel argues that he was not at fault in creating the situation that gave rise to the fight, and therefore, he was entitled to a self-defense instruction. We disagree.

{¶128} To establish self-defense, the defendant must show by a preponderance of the evidence (1) that he was not at fault in creating the situation giving rise to the affray, (2) that he had a bona fide belief that he was in imminent danger of great bodily harm and that his only means of escape from such danger was in the use of such force, and (3) that he must not have violated any duty to retreat or avoid danger. *State v. Barnes*, 94 Ohio St.3d 21, 24 (2002), citing *State v. Robbins*, 58 Ohio St.2d 74 (1979), paragraph two of the syllabus. "If the defendant fails to prove *any one* of these elements by a preponderance of the evidence he has failed to demonstrate that he acted in self-defense." (Emphasis sic.) *State v. Jackson*, 22 Ohio St.3d 281, 284 (1986).

{¶129} In denying Thiel's request for a self-defense instruction, the trial court found that Thiel failed to meet the abovementioned requirements. It explained, "The evidence was clear that [Thiel] did follow the victim, the alleged victim, out of the bar; that when the victim got out of his truck, he met him." Trial Tr., p. 356. Thiel argues, however, that he was not at fault in creating the situation that gave rise to the fight. He claims that he only engaged in physical contact with Boden after Boden swung at him. He explains,

> [T]here was testimony that [Boden] and [Wellmerling] walked past
> [Thiel] and [Young] as they were leaving the bar (even though they

were seated by the front of the bar, they exited the back door). As they walked past [Thiel], [Wellmerling] made comments to both [Thiel] and [Young], including insensitive comments about [Thiel's] mother. After they exited the bar, [Thiel] got up and followed [Wellmerling] outside. [Thiel] specifically testified he wanted to talk to [Wellmerling] about why she made the comments about his mother. * * * [Thiel] stated he never touched [Wellmerling], and even [Wellmerling] testified that he did not grab her arm, but merely grazed her arm. * * * [Wellmerling] stated [Thiel] was not aggressive towards her. * * * In fact, [Wellmerling] testified that [Thiel] said nothing to her at the door of the truck. * * *

[Boden] testified he got out of his truck and he met [Thiel] at the back of the vehicle. [Thiel] and others testified that Boden swung at [Thiel]. * * * [Thiel] testified that Boden punched him in the face, causing injury (photos of [Thiel's] face were admitted at trial). * * * In order to protect himself, [Thiel] testified he took Boden to the ground and applied a headlock or chokehold.

Appellant's Brief, p. 14-15.

{¶130} It is readily apparent that the tension between Thiel and Boden escalated over the course of the night. There was testimony about a verbal exchange at Kirby Fest; multiple verbal exchanges inside the bar; and an altercation in the smoking area outside the bar. That tension reached a boiling point later that night when Thiel followed Boden and Wellmerling out of the bar and touched/grazed Wellmerling's arm. At that point, Boden got out of his truck and ran toward the back of the truck. In response, Thiel ran to the back of the truck too, and the two men started fighting.

{¶131} One could easily infer why Boden and Thiel suddenly ran toward the back of the truck: to fight. Because Thiel chose to engage in a physical altercation

with Boden—when he was in the middle of having what he described as a pleasant and friendly conversation with Wellmerling—the trial court could have reasonably concluded that Thiel was at fault in giving rise to the situation that led to the fight.

{¶132} For these reasons, we find that the trial court did not abuse its discretion in denying Thiel's request for a self-defense instruction.

{¶133} Accordingly, we overrule Thiel's second assignment of error.

*Assignment of Error No. I*

{¶134} In his first assignment of error, Thiel argues that the trial court erred by failing to give his requested jury instructions on complicity. Specifically, Thiel argues that the jury should have been instructed that "[t]o support a conviction for complicity, the evidence must show beyond a reasonable doubt, that the Defendant knowingly, assisted, encouraged, cooperated with, advised, or incited [Young] in the commission of felonious assault, and that the Defendant shared the criminal intent of [Young]," and "[t]he mere presence of an accused at the scene of the crime is not sufficient to prove, in and of itself, that the Defendant was an aider and abettor." (Docket No. 36, p. 2). We disagree.

{¶135} Generally, the trial court should give requested jury instructions "if they are correct statements of the law applicable to the facts in the case * * *." *Murphy v. Carrollton Mfg. Co.*, 61 Ohio St.3d 585, 591 (1991). But, "[i]nstructions that in their totality are sufficiently clear to permit the jury to understand the relevant

law will not be the cause of a reversal upon appeal." *Schnipke v. Safe-Turf Installation Group, L.L.C.*, 190 Ohio App.3d 89, 2010-Ohio-4173, ¶ 30 (3d Dist.), citing *Burns v. Prudential Secs., Inc.*, 167 Ohio App.3d 809, 2006-Ohio-3550, ¶ 41 (3d Dist.). "When reviewing a trial court's jury instructions, the proper standard of review for an appellate court is whether the trial court's refusal to give a requested jury instruction constituted an abuse of discretion under the facts and circumstances of the case." *State v. Leasure*, 4th Dist. Ross No. 15CA3484, 2015-Ohio-5327, ¶ 49, citing *State v. Ellis*, 5th Dist. Fairfield No. 02 CA 96, 2004-Ohio-610, ¶ 19; *see also State v. Wolons*, 44 Ohio St.3d 64, 68 (1989).

R.C. 2923.03, Ohio's complicity statute, provides,

(A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:

* * *

(2) Aid or abet another in committing the offense;

* * *

{¶136} The Ohio Judicial Conference suggests the following jury instruction for complicity by aiding and abetting:

The defendant is charged with complicity in the commission of the offense of (specify offense). Before you can find the defendant guilty, you must find beyond a reasonable doubt, that on or about the ____ day of _____, _____, and in _____ (County) (other jurisdiction), Ohio, the defendant (insert applicable culpable mental state if one is required for the commission of the principal offense) * * * .

\* \* \*

(A)(2) aided or abetted another in committing the offense of (specify offense).

\* \* \*.

(Emphasis added.) *Ohio Jury Instructions*, CR Section 523.03(1)(A)(2) (Rev. Feb. 6, 2016).

{¶137} Consistent with the Ohio Jury Instructions, the trial court gave the following instruction on complicity:

> The Defendant is charged in Count Two of the indictment with complicity in the commission of the offense of felonious assault. Before you can find the defendant guilty, you must find beyond a reasonable doubt that on or about the 17th day of August, 2014, and in Wyandot County, Ohio, the defendant knowingly aided or abetted another in committing the offense of felonious assault.
>
> 'Knowingly' A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result. A person has knowledge of circumstances when he is aware that such circumstances probably exist.

{¶138} The trial court's instruction also included the following:

> 'Aided or abetted' means supported, assisted, encourages, cooperated with, advised, or incited.

Trial Tr., p. 397-398.

{¶139} Thiel argues that the trial court abused its discretion in failing to instruct the jury pursuant to the Supreme Court of Ohio's finding in *State v.*

*Johnson,* 93 Ohio St.3d 240 (2001) and the February 2016 revision of the OJI definition of aiding and abetting.[3]  Specifically, he claims that the jury should have also been instructed that to support a conviction for complicity, the State needed to prove beyond a reasonable doubt that the he shared Young's criminal intent.

**{¶140}** *Johnson* is distinguishable from the facts of this case.  In *Johnson,* the Supreme Court of Ohio found that

> [t]o support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and *that the defendant shared the criminal intent of the principal.*  Such intent may be inferred from the circumstances surrounding the crime.

(Emphasis added.)  *Id.* at syllabus.  There, however, the defendant was charged with complicity to commit aggravated murder by aiding and abetting in violation of R.C. 2903.01(A) and 2923.03(A)(2).  R.C. 2903.01(A) provides, "No person shall *purposely*, and with prior calculation and design, cause the death of another or the unlawful termination of another's pregnancy."  (Emphasis added.)  Thus, in order for the defendant in *Johnson* to be convicted of complicity to commit aggravated

---

[3] The OJI February 2016 revision of the definition of aiding and abetting reads: "Before you can find the defendant guilty of complicity by aiding and abetting, you must find beyond a reasonable doubt that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal offender in the commission of the offense and that the defendant shared the criminal intent of the principal offender. Such intent may be inferred from the circumstances surrounding the offense including but not limited to presence, companionship, and conduct before and after the offense was committed. The mere presence of the defendant at the scene of the offense is not sufficient to prove, in and of itself, that the defendant was an aider and abettor." CR Section 523.03(1)(A)(8).  The comment to this instruction indicates that the instruction was drawn from *State v. Johnson*, 93 Ohio St.3d 240 (2001).

murder by aiding or abetting, he must have purposely aided or abetted the principal

in the commission of aggravated murder because purposely is the culpable mental

state required for the offense of aggravated murder.[4]  In considering whether the

defendant was complicit, the Court explained,

> Defendant and his fellow gang members hatched a calculated plan to kill Boom in order to avenge the shooting of their fellow gang member, McGaha. Defendant rode in the lead car with the shooter looking for their intended target. Sidney Cornwell and his associates, including defendant, intended to shoot Boom, but they killed Jessica Ballew and injured three others instead, and for those acts defendant is responsible as a complicitor.

*Johnson*, at 245.

{¶141} Unlike the defendant in *Johnson*, Thiel was charged with complicity

to commit felonious assault by aiding and abetting in violation of R.C.

2903.11(A)(1) and 2923.03(A)(2).  R.C. 2903.11(A)(1) provides, "No person shall

*knowingly* * * * [c]ause serious physical harm to another * * * ."  (Emphasis added.)

Thus, in order for Thiel to be convicted of complicity to commit felonious assault

by aiding or abetting, he must have knowingly aided or abetted Young in the

---

[4] "A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature."  ORC 2901.22(A).  The following is an additional instruction found in OJI: "Purpose is a decision of the mind to do an act with a conscious objective of (producing a specific result) (engaging in specific conduct). To do an act purposely is to do it intentionally and not accidentally. *Purpose and intent mean the same thing*. The purpose with which a person does an act is known only to himself/herself, unless he/she expresses it to others or indicates it by his/her conduct.  CR Section 417.01(4).  (Emphasis added.)

commission of felonious assault because knowingly is the culpable mental state required for the offense of felonious assault.

{¶142} While Thiel argues that he did not share Young's intent to cause Boden harm, it is not necessary, for the offense of felonious assault or complicity to commit felonious assault by aiding or abetting, that a defendant act purposely (i.e., with specific intent).  A defendant must only act knowingly.  "A person acts knowingly, *regardless of purpose*, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature.  A person has knowledge of circumstances when the person is aware that such circumstances probably exist." (Emphasis added.)  R.C. 2901.22(B).

{¶143} Therefore, because Thiel was charged with complicity to commit felonious assault by aiding and abetting, the State was not required to prove beyond a reasonable doubt that Thiel shared the same purpose (i.e., specific intent) as Young.  It was only required to prove beyond a reasonable doubt that Thiel acted with the same culpable mental state required for the commission of the principal offense, in this case, knowingly.

{¶144} For these reasons, we find that the trial court did not abuse its discretion in failing to give Thiel's requested jury instruction on complicity.

{¶145} Thiel also argues that the trial court erred in failing to instruct the jury that "[t]he mere presence of an accused at the scene of the crime is not sufficient

to prove, in and of itself, that the Defendant was an aider and abettor." (Docket No. 36, p. 2). However, while this instruction was included in Thiel's proposed jury instructions, Thiel did not renew his request at trial or otherwise object to the trial court's failure to give this instruction.

{¶146} "On appeal, a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection." Crim.R. 30(A). The Supreme Court of Ohio has repeatedly held that a failure to object before the jury retires in accordance with this provision, absent plain error, constitutes a waiver. *State v. Williford*, 49 Ohio St.3d 247, 251 (1990), citing *State v. Underwood*, 3 Ohio St.3d 12 (1983). To have plain error under Crim.R. 52(B), the error must be an "obvious" defect in the trial proceedings that affected the defendant's "substantial rights." *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). Plain error is to be used "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id*. Further, plain error only exists where "but for the error, the outcome of the trial would clearly have been otherwise." *State v. Biros*, 78 Ohio St.3d 426, 431 (1997).

{¶147} While Thiel's proposed jury instruction was a correct statement of law, we cannot say its omission amounted to plain error under the facts of this case.

{¶148} Accordingly, Thiel's first assignment of error is overruled.

*Assignment of Error No. VI*

**{¶149}** In his sixth assignment of error, Thiel argues that his conviction is against the manifest weight of the evidence. Specifically, Thiel claims that he "did not share the criminal intent with [Young] in causing serious physical harm to [Boden]." Appellant's Brief, p. 21. He argues that he took Boden to the ground in self-defense and never intended to harm Boden. We disagree.

**{¶150}** When an appellate court analyzes a conviction under the manifest weight standard, it "sits as the thirteenth juror." *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), *superseded by constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89 (1997). Accordingly, it must review the entire record, weigh all of the evidence and its reasonable inferences, consider the credibility of the witnesses, and determine whether the fact finder "clearly lost its way" in resolving evidentiary conflicts and "created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). When applying the manifest weight standard, a reviewing court should only reverse a trial court's judgment "in exceptional case[s]" when the evidence "weighs heavily against the conviction." *Id.* at paragraph three of the syllabus.

**{¶151}** Here, whether the verdict was against the manifest weight of the evidence turns on the credibility of the witnesses. "[T]he weight to be given the

evidence and the credibility of the witnesses are primarily for the trier of the facts."
*State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. In other words, "jurors are entitled to believe the testimony offered by the State's witnesses." *State v. Wareham*, 3d Dist. Crawford No. 3-12-11, 2013-Ohio-3191, ¶ 25, citing *State v. Bates*, 12th Dist. Butler No. CA2009-06-174, 2010-Ohio-1723, ¶ 11.

**{¶152}** Boden and Thiel were the main witnesses to testify at trial. Boden stated that after he and Thiel wrestled to the ground, Thiel put him in a headlock. He stated that while he was in the headlock, he saw Young run out of the bar, get on top of him, and start punching him repeatedly in his right eye. This is corroborated by other witnesses' testimony and the fact that Boden's injuries were limited to the area surrounding his right eye. Boden stated that while this was going on, he was screaming and begging the men to stop. Thiel claimed, however, that while he initially put Boden in a headlock out of self-defense, he released Boden before Boden was assaulted. He stated that he did not know that Young was assaulting Boden and he did not hear Boden screaming and begging the men to stop. Another witness testified, however, that they heard Boden screaming.

**{¶153}** Again, the offense of complicity to commit felonious assault by aiding and abetting requires a defendant to knowingly aid or abet the principal in the commission of felonious assault because knowingly is the culpable mental state for felonious assault. "A person acts knowingly, *regardless of purpose*, when the

person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." (Emphasis added.) R.C. 2901.22(B).

**{¶154}** The jury was free to believe Boden's testimony (and the testimony of the other witnesses) that Thiel had him in a headlock while Young assaulted him. The jury was also free to infer from the surrounding circumstances (e.g., Boden's cries for help) that Thiel acted knowingly. Given the evidence, this is not the exceptional case where the trier of fact lost its way and committed a miscarriage of justice in finding Thiel guilty of this offense.

**{¶155}** Accordingly, we overrule Thiel's sixth assignment of error.

*Assignment of Error No. V*

**{¶156}** In his fifth assignment of error, Thiel argues that the trial court erred in denying his motion for a new trial. Specifically, Thiel argues that a new trial is warranted because (1) the jury was unduly pressured and coerced to reach a verdict and (2) one of the jurors was confused about the definition of knowingly.[5] We disagree.

Crim.R. 33(A) provides,

---

[5] Thiel also argues that the trial court committed an error of law in failing to instruct the jury on self-defense. However, since we already determined that the trial court did not err in failing to instruct the jury on self-defense, we need not consider this issue again.

A new trial may be granted on motion of the defendant for any of the following causes affecting materially his substantial rights:

(1) Irregularity in the proceedings, or in any order or ruling of the court, or abuse of discretion by the court, because of which the defendant was prevented from having a fair trial;

* * *.

**{¶157}** The decision to grant or deny a motion for a new trial lies within the sound discretion of the trial court and will not be disturbed absent an abuse of discretion. *State v. King*, 3d Dist. Seneca No. 13-02-20, 2002 WL 479159 (March 29, 2002), * 2, citing *State v. Schiebel*, 55 Ohio St.3d 71 (1990), paragraph one of the syllabus.

**{¶158}** The record indicates that at 5:24 p.m., the jury retired to the jury room to begin deliberations. At 6:09 p.m., the jury submitted the following question: "What is the definition of felonious assault?" Trial Tr., p. 405. After discussing the matter with the State and defense counsel, the trial court answered, "Please refer to pages 5 & 6 of the jury instructions." *Id*. At 7:43 p.m., the jury submitted a second question: "What happens if we all don't agree on the first two charges?" *Id*. at p. 406. After discussing the matter with the State and defense counsel, the trial court answered, "Keep working please and see how it goes." *Id*. at p. 407. Later that evening, the jury indicated that it had reached a verdict.

{¶159} Thiel argues that the trial court's answer unduly pressured and coerced the jury into reaching a verdict. Attached to his motion were the affidavits of three jurors whom all stated,

\* \* \*

4. At approximately 7:30 p.m., the jury was having trouble reaching a verdict. The jury sent a written note to the court asking what to do. The court responded to keep working.

5. At that point, I believed the court would not let us leave for the evening until we reached a verdict. I felt pressured and unduly coerced.

\* \* \*.

(Docket No. 58, Ex. A-C).

{¶160} Thiel also argues that one of the jurors was confused about the definition of "knowingly." He points to a juror's claim that "[i]n addition to the above, I was misled by other members of the jury as to the definition of "knowingly" aiding and abetting. The jury believed that given [Thiel] walked outside and confronted [Boden's] girlfriend, [Thiel] knew that something like the assault in question could have happened." (*Id*. at Ex. A).

{¶161} Thiel did not object to the trial court's answer to the jury's second question at trial, and therefore, he has waived all but plain error. *State v. Bump*, 3d Dist. Logan No. 8-12-04, 2013-Ohio-1006, ¶ 81. Plain error does not exist here. After the jury had deliberated for roughly two hours, it asked the trial court "what

happens *if* we all don't agree on the first two charges?" (Emphasis added). Trial Tr., p. 406. The jury never affirmatively indicated that it was deadlocked. The trial court told the jury, "Keep working please and see how it goes." *Id*. at p. 407. The trial court never told the jury that it had to issue a finding of guilty or not guilty or otherwise improperly pressured the jury to reach a verdict.

{¶162} Thiel also failed to raise the issue of juror confusion in his motion for a new trial. "An appellate court will not entertain issues that were not raised in the trial court first." *State v. Anderson*, 10th Dist. Franklin No. 13-AP-831, 2014-Ohio-1849, ¶ 19, citing *State v. Brown*, 6th Dist. No. L–98–1130 (Aug. 21, 1998) (issues not raised in motion for a new trial pursuant to Crim.R. 33 cannot be raised for the first time on appeal); *State v. Williams*, 51 Ohio St.2d 112 (1977) (it is axiomatic that arguments which are not raised in the trial court are waived for purposes of appeal).

{¶163} For these reasons, we find that the trial court did not abuse its discretion in denying Thiel's motion for a new trial.

{¶164} Accordingly, we overrule Thiel's fifth assignment of error.

*Assignment of Error No. VIII*

{¶165} In his eighth assignment of error, Thiel argues that the trial court erred by failing to hold a restitution hearing after he disputed the amount of restitution at sentencing. We agree.

{¶166} R.C. 2929.18(A)(1) provides, in relevant part,

> If the court imposes restitution, the court shall order that the restitution be made to the victim in open court, to the adult probation department that serves the county on behalf of the victim, to the clerk of courts, or to another agency designated by the court. If the court imposes restitution, at sentencing, the court shall determine the amount of restitution to be made by the offender. If the court imposes restitution, the court may base the amount of restitution it orders on an amount recommended by the victim, the offender, a presentence investigation report, estimates or receipts indicating the cost of repairing or replacing property, and other information, provided that the amount the court orders as restitution shall not exceed the amount of the economic loss suffered by the victim as a direct and proximate result of the commission of the offense. If the court decides to impose restitution, the court shall hold a hearing on restitution if the offender, victim, or survivor disputes the amount.

{¶167} At the sentencing hearing, the trial court ordered Thiel to pay, jointly and severally with Young, $21,519.37 to Boden. Defense counsel objected to that amount, arguing that Boden's medical bills were not introduced into evidence or authenticated. He stated, "I have the supposed bills but I - - no doctors testified, no custodian of records testified, so that's my - - the basis of my objection." March 1, 2016 Hrg., p. 22. The State argued that the amount was justified and submitted Boden's medical bills. Again, Thiel objected, noting that the bills had not been authenticated.

{¶168} R.C. 2929.18(A)(1) is clear: if the offender disputes the amount of restitution then the trial court shall hold a restitution hearing before imposing

restitution. Thiel objected to amount of restitution at sentencing, and therefore, he is entitled to a restitution hearing.[6]

**{¶169}** Accordingly, we sustain Thiel's eighth assignment of error.

*Assignment of Error No. VII*

**{¶170}** In light of our disposition of Thiel's other assignments of error, his remaining assignment of error is rendered moot and need not be considered. App.R. 12(A)(1)(c).

**{¶171}** Having found error prejudicial to Thiel, in some of the particulars assigned and argued, we affirm, in part, reverse, in part, the judgment of the trial court, and remand the matter for further proceedings consistent with this opinion.

> ***Judgment Affirmed in Part,***
> ***Reversed, in Part and***
> ***Cause Remanded***

**SHAW and WILLAMOWSKI, J.J., concur.**

**/jlr**

---

[6] We also note that the trial court's judgment entry failed to expressly state to whom restitution was to be paid.